CASE NO. 12-56589

_____

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

FERNANDO RUIZ, individually and on behalf of all others similarly situated,
Plaintiff-Appellant,

v.

AFFINITY LOGISTICS CORP.,
Defendant/Appellee.

_____

ON APPEAL FROM THE U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
Case No. 3:05-cv-2125-JLS/CAB

THE HONORABLE JANIS L. SAMMARTINO

_____

APPELLEE BRIEF OF AFFINITY LOGISTICS CORP.

_____

James H. Hanson
jhanson@scopelitis.com
David D. Robinson
drobinson@scopelitis.com
SCOPELITIS, GARVIN, LIGHT,
HANSON & FEARY, P.C.
10 W. Market Street, Suite 1500
Indianapolis, IN 46204
(317) 637-1777

Adam C. Smedstad
asmedstad@scopelitis.com
SCOPELITIS, GARVIN, LIGHT,
HANSON & FEARY, P.C.
30 W. Monroe Street, Suite 600
Chicago, IL 60603
(312) 255-7181

Additional counsel listed on attached page

Daniel R. Barney
SCOPELITIS, GARVIN, LIGHT,
HANSON & FEARY, P.C.
1850 M Street, N.W., Suite 280
Washington, DC 20036-5804
(202) 783-9222

Kathleen C. Jeffries
SCOPELITIS, GARVIN, LIGHT,
HANSON & FEARY, LLP
2 North Lake Avenue, Suite 460
Pasadena, CA 91101
(626) 795-4700

Counsel for Defendant/Appellee,
Affinity Logistics Corp.

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned, counsel of record for Defendant/Appellee, Affinity Logistics Corp. ("Affinity"), certifies to the following:

1.     Through a series of acquisitions and mergers in or about 2007, Affinity is now known as 3PD, Inc. ("3PD").

2.     3PD's parent corporation is 3PD Holding, Inc.

3.     No publicly-held corporation owns any of the stock of 3PD Holdings, Inc.


/s/ James H. Hanson
James H. Hanson

Attorney for Defendant/Appellee,
Affinity Logistics Corp.

# **Table of Contents**

CORPORATE DISCLOSURE STATEMENT ..........................................................i

TABLE OF CONTENTS ...............................................................................ii

TABLE OF AUTHORITIES ........................................................................iv

I.     STATEMENT OF JURISDICTION ................................................1

II.    STATEMENT OF THE CASE ........................................................1

III.   STATEMENT OF FACTS ..............................................................3

    A.  Affinity Provided Logistics Support Services ..........................3

    B.  Affinity and Contractors Executed ITA and ELA ...................4

    C.  Contractors Operated Businesses..............................................5

    D.  Contractors Supplied Equipment and Paid Expenses ..............6

    E.  Contractors Supplied and Paid Drivers and Helpers................7

    F.  Customer Needs Dictated Routes .............................................8

    G.  Customer Needs Dictated Delivery Locations and Timing .....9

    H.  Customer Needs Dictated Standards........................................10

    I.  Procedures Manuals Reflected Requirements ........................11

    J.  Routes Contractors Selected Impacted Profits.......................12

    K.  Stand-Up Meetings.................................................................13

    L.  Contractors Negotiated Rates.................................................13

    M.  Skills Required More Than Ability to Drive ..........................13

    N.  Ruiz Formed R&S Logistics ...................................................14

IV.    SUMMARY OF THE ARGUMENT ...........................................15

V.     STANDARD OF REVIEW ..........................................................18

VI.    ARGUMENT................................................................................21

    A.  Substantial Evidence Supports the District Court's Findings................22

    B.  California Law Prescribes A Multi-Factor Test......................26

C. California Public Policy Underpins the Multi-Factor Test ..................... 30

D. The District Court Correctly Applied the Multi-Factor Test ................. 33

    1. The District Court Correctly Found Affinity Neither Reserved the Right to Control Nor Controlled the Details of the Work ............... 35

    2. The District Court Correctly Found the Secondary Factors Confirmed Independent Contractor Status ...................................... 41

        a. Right to Terminate at Will and Length of Relationship ...... 41

        b. Distinct Occupation or Business ........................................... 42

        c. Work Usually Done without Direction or Supervision/Skill Required ............................................................................... 46

        d. Payment of Business Expenses/Investment in Equipment .. 48

        e. Method of Payment ............................................................. 51

        f. Work Part of Employer's Regular Business ........................ 52

        g. Belief of the Parties ............................................................ 53

        h. Opportunity for Profit or Loss ............................................ 53

E. Neither California Law nor the Evidence Support the Conclusion Ruiz Was Affinity's Employee for Some Purposes .................................... 54

    1. Ruiz Waived This Issue ................................................................. 55

    2. California Law Does Not Support the Conclusion that Ruiz Was Affinity's Employee for Some Purposes and an Independent Contractor for Others .................................................................... 56

    3. The Record Contains No Evidence to Determine When Ruiz and the Other Contractors Were Employees ...................................... 57

VII. CONCLUSION ............................................................................. 58

STATEMENT OF RELATED CASES ................................................... 59

CERTIFICATE OF COMPLIANCE ...................................................... 60

## **Table of Authorities**

*Air Couriers Int'l. v. Emp't Dev. Dep't,*
  59 Cal. Rptr. 3d 37 (Cal. Ct. App. 2007) ...................................... 35

*Alohacare v. Hawaii Dep't Human Servs.,*
  572 F.3d 740 (9th Cir. 2009) ....................................................... 55

*Amerigas Propane, LP v. Landstar Ranger, Inc.,*
  109 Cal. Rptr. 3d 686 (Cal. Ct. App. 2010) ................................... 36

*Arnold v. Mut. Of Omaha Ins. Co.,*
  135 Cal. Rptr. 3d 213 (Cal. Ct. App. 2011) ................................... 41

*Arzate v. Bridge Terminal Transp.,*
  121 Cal. Rptr. 3d 400 (Cal. Ct. App. 2011) ................................21, 26-27, 41

*Bohanon v. James McClatchy Publ'g Co.,*
  60 P.2d 510 (Cal. Ct. App. 1936) ..................................... 32, 37, 38

*Bonnetts's v. Arctic Express, Inc.,*
  7 F. Supp. 2d 977 (S.D. Ohio 1998) ............................................ 49

*Bowman v. Wyatt,*
  111 Cal. Rptr. 3d 787 (Cal. Ct. App. 2010) ........................... 27, 30

*Byers v. Comm'r,*
  T.C. Memo 2007-331, 2007 WL 3254338 (U.S.T.C. Nov. 5, 2007) ........... 49

*Casillas v. U.S. Navy,*
  735 F.2d 338 (9th Cir. 1984) ...............................24, 25, 39, 40, 41

*Chin v. United States,*
  57 F.3d 722 (9th Cir. 1995) ....................................................... 20

*Cristler v. Express Messenger Sys., Inc.,*
  89 Cal. Rptr. 3d 34 (Cal. Ct. App. 2009) ...............................*passim*

*Cristler v. Express Messenger Sys., Inc.*,
    No. GIC 803519, 2007 WL 3128497
    (Cal. Super. Ct. Feb. 26, 2007) ...........................................26, 28, 38, 46, 53

*Deegan v. Continental Cas. Co.*,
    167 F.3d 502 (9th Cir. 1999) ....................................................18, 24, 34, 39

*Estrada v. FedEx Ground Package System, Inc.*,
    64 Cal. Rptr. 3d 327 (Cal. Ct. App. 2007) .............................................*passim*

*Estrada v. FedEx Ground*, No. BC 210130,
    2004 WL 5631425 (Cal. Super. Ct. Jul, 26, 2004) ...............................*passim*

*FedEx Home Delivery v. NLRB*,
    563 F.3d 492 (D.C. Cir. 2009) .............................................................37, 53

*Golden Gate Hotel Ass'n v. City & County of San Francisco*,
    18 F.3d 1482 (9th Cir. 1994) .......................................................................34

*Gonzales v. Free Speech Coal.*,
    408 F.3d 613 (9th Cir. 2005) .......................................................................34

*In re MDL-1700 FedEx Ground Package Sys. Inc. Employment Practices Litig.*,
    758 F. Supp. 2d 638 (N.D. Ind. 2010) ...................................................28, 53

*Jones v. U.S.*,
    127 F.3d 1154 (9th Cir. 1997) .................................................................23-25

*JKH Enters., Inc. v. Dep't of Indus. Relations*,
    48 Cal. Rptr. 3d 563 (Cal. Ct. App. 2006) ...................................................30

*Lads Trucking Co. v. Bd. of Trs. of the W. Conference of Teamsters Trust Fund*,
    777 F.2d 1371 (9th Cir. 1985) ...............................................................18-20

*Loya v. Starwood Hotels & Resorts Worldwide, Inc.*,
    583 F.3d 656 (9th Cir. 2009) .......................................................................56

*Martinez v. Combs*,
    231 P.3d 259 (Cal. 2010) .............................................................................31

*McGuire v. U.S.*,
    349 F.2d 644 (9th Cir. 1965) ............................................................... 20, 22

*Merchants Home Delivery Servs., Inc. v. NLRB*,
    580 F.2d 966, 975 (9th Cir. 1978) ............................................................ 48

*Millsap v. FedEx Corp.*,
    277 Cal. Rptr. 807 (Cal. Ct. App. 1991) ..................................... 26, 32, 36, 38

*Narayan v. EGL, Inc.*,
    CV-05-04181-RMW, 2010 WL 3035487 (9th Cir. Jul. 13, 2010) 20, 30, 40, 42

*Prof'l & Executive Leasing, Inc. v. Comm'r IRS*,
    862 F.2d 751 (9th Cir. 1998) ............................................................... 20, 22

*Purer & Co. v. Aktiebolaget Addo*,
    410 F.2d 871 (9th Cir. 1969) ..................................................... 20, 23, 24, 40

*R.A. Beaver v. United States*,
    350 F.2d 4 (9th Cir. 1965) ................................................................... 23, 34

*Ramirez v. City of Buena Park*,
    560 F.3d 1012 (9th Cir. 2009) ................................................................... 55

*Recon Refractory & Constr., Inc. v. NLRB*,
    424 F.3d 980 (9th Cir. 2005) ..................................................................... 23

*Sahinovic v. Consol. Delivery & Logistics, Inc.*,
    No. C 02-4966 SBA, 2004 WL 5833528
    (N.D. Cal. Sept. 13, 2004) ................................................ 32, 37, 46, 48, 51

*S.G. Borello & Sons, Inc. v. Dep't. of Indust. Rel.*,
    769 P.2d 399 (Cal. 1989) ................................................................. *passim*

*SIDA of Hawaii, Inc. v. NLRB*,
    512 F.2d 354 (9th Cir. 1975) ..................................................................... 37

*State Comp. Ins. Fund v. Brown*,
    38 Cal. Rptr. 2d 98, 106 (Cal. Ct. App. 1995) ................................. 26, 32, 38

*State Farm Mut. Auto. Ins. Co. v. White*, 563 F.2d 971
    (9th Cir. 1977)  ................................................................. 24, 25, 40

*Stull v. Noble Logistics Servs.*,
    No. C064308, 2011 WL 2225137 (Cal. App. Jun. 8, 2011) ................ *passim*

*Sw. Research Inst. v. Unemp't Ins. Appeals Bd.*,
    96 Cal. Rptr. 2d 769 (Ct. App. 2000)  ......................................... 36

*Thomas v. Andrus*,
    552 F.2d 871 (9th Cir. 1977)  ................................. 24, 25, 40, 41, 53

*Van Camp & Bennion v. United States*,
    251 F.3d 862 (9th Cir. 2001)  ............................................... 20, 22

*Varisco v. Gateway Sci. & Eng'g, Inc.*,
    83 Cal. Rptr. 3d 393, 397-98 (Cal. Ct. App. 2008)  ..................... 42

*Wirts v. San Francisco & Oakland Helicopter Airlines, Inc.*,
    370 F.2d 328 (9th Cir. 1966)  ............................................... 20, 22

## Statutes

49 C.F.R. Part 376 ...................................................................... 4

# I.
## STATEMENT OF JURISDICTION

Defendant/Appellee, Affinity Logistics Corp. ("Affinity"), does not take issue with the jurisdictional statement supplied in the opening brief of Plaintiff/Appellant, Fernando Ruiz ("Ruiz") ("Appellant's Brief").

# II.
## STATEMENT OF THE CASE

Affinity provided regulated, for-hire home delivery and transportation logistics support services to various home furnishing retailers. Ruiz supplied equipment and labor necessary to complete those deliveries for Sears in and around San Diego. In providing those services, Ruiz enjoyed freedoms and flexibility in the manner in which he conducted his business that no employee would have. This freedom included hiring a driver to operate his truck on days he did not operate it, operating multiple trucks, and hiring other drivers and helpers to operate those trucks, and even electing, for several months, to not *personally perform* any of the work he contracted to complete.

On May 17, 2005, Ruiz filed this action seeking relief on behalf of himself and other contractors who supplied equipment and labor to complete deliveries for Sears. Ruiz's collective action sought overtime compensation under the Fair Labor Standards Act ("FLSA") and his class action sought recovery under various California wage and hour laws. The District Court granted Affinity summary judgment on Ruiz's overtime claims. ER 94, 98, 103-104.

1

The District Court later certified a class of all California contractors for the limited purpose of determining whether Affinity properly classified Ruiz and the other contractors as independent contractors.[1] *Ruiz v. Affinity Logistics Corp*., No. 05CV2125, 2009 WL 648973, at *1 (S.D. Cal. Jan. 29, 2009). The District Court refused to certify Ruiz's substantive California state law claims. *Id.* Ruiz is not appealing either the judgment on his overtime claims or the District Court's refusal to certify his state law claims.

The District Court conducted a four-day bench trial in December, 2009 (the "Trial").[2] On March 22, 2010, the District Court issued its Memorandum Decision finding that, based on the preponderance of the evidence, Ruiz and the other contractors were properly classified as independent contractors under the Georgia state law. ER 29-54. On appeal, this Court reversed the District Court because it found that the District Court should have applied California law instead of Georgia law and remanded the case to determine whether Ruiz should have been classified as an employee or independent contractor under California law. ER 128-38.

---

[1] It was a certification under Rule 23(c)(4).

[2] The Court received into evidence the testimony of four former contractors, Ruiz, Gabriel Mejia ("Mejia"), Alfonzo Sanchez ("Sanchez"), and Oscar Reyes ("Reyes"), two Affinity representatives, Charles Hitt and Danny Hansen ("Hansen"), and Affinity's expert witness, Robert Crandall.

Applying California law, the District Court, again found that, based on the evidence at Trial, Affinity carried its burden of establishing that Ruiz was properly classified as an independent contractor under California law (the "Final Judgment"). ER 8-28.

### III.
### STATEMENT OF FACTS

The District Court made the following factual findings:[3]

**A.    Affinity Provided Logistics Support Services**

Affinity was a Georgia corporation engaged in business as a contract carrier of property operating under the authority of the Federal Motor Carrier Safety Administration, pursuant to a permit issued by the Federal Highway Administration on May 3, 1999. *See* ER 30, 35, 72, 74, 770.

Affinity provided regulated, for-hire home delivery and transportation logistics services to various retailers, including Sears, Home Depot EXPO, J.C. Penney, Wickes and Brueners. ER 30, 72. The transportation logistics services Affinity provided involved coordinating the delivery of merchandise and arranging for equipment and labor necessary to facilitate such deliveries. ER 25, 52.

---

[3] The Final Judgment contains factual findings and also incorporated, as unchanged, the factual findings set forth in the Memorandum Decision. ER 10. Affinity relies only on the factual findings of the District Court.

Affinity entered a Home Delivery Carrier Agreement with Sears to arrange for the delivery of home furnishings and appliances to Sears' customers from the Sears San Diego Market Delivery Operation (the "San Diego MDO"). ER 30, 72-73. Sears owned the San Diego MDO, but provided Affinity with an office at the facility. ER 10, 30.

**B.** **Affinity and Contractors Executed ITA and ELA**

Affinity neither installed appliances nor completed the deliveries it arranged. ER 25, 52. Affinity subcontracted the delivery and installation work to contractors like Ruiz pursuant to Independent Truckman's and Equipment Lease Agreements (the "ITA" and "ELA," respectively). ER 25, 52, 279.

The ELA represented a standard contractual relationship utilized in the delivery business. ER 31, 279. The Federal Leasing Regulations ("FLR"), 49 C.F.R. Part 376, governed some terms of the ELA and dictated that (a) contractors receive weekly settlements evidencing their compensation; (b) contractors sign the ELA; (c) contractors fill out time sheets and manifest logs; and (d) deductions from contractors' compensation appear on their weekly settlement payments. ER 35.

Pursuant to the ITA, "[t]he parties intend[ed] to create an independent contractor relationship and not an employer-employee relationship." ER 31, 751. Similarly, under the ELA, it was "expressly understood and agreed that Contractor is an independent contractor of Affinity." ER 31, 758. The contractors further

agreed to "direct the operation of any equipment in all respects," "determine the means of performance including but not limited to such matters as choice of any routes, points of service of equipment, rest stops, and timing and scheduling of customer deliveries," "determine the means of performance [and] direct the operation of" the equipment the contractors leased to Affinity.  ER 31, 751, 758.

Under the ITA and ELA and in fact, the contractors supplied the equipment and labor necessary to complete Sears' deliveries.[4]  ER 10-11, 14, 20, 27-28, 31, 751, 758.  While contractors *could* accomplish the deliveries themselves, they were not required to do so.  ER 11, 751-57, 758-69.  Ruiz, for example, did not personally perform any of the delivery or driving services for many months when he was injured.  ER 27, 37.

## C.  <u>Contractors Operated Businesses</u>

Contractors formed and operated distinct businesses, which included business names, separate business banking accounts, and the responsibility to pay employee wages and taxes and other business expenses.  ER 20, 37, 49.  While some contractors would not have established these businesses if not for their

---

[4] The ELA provided that "Affinity hereby leases from Contractor, the equipment and driver."  ER 31.  The ELA did not specify or otherwise require that the contractor who entered into the agreement be the driver whose services Affinity leased.

relationship with Affinity,[5] the contractors chose to establish these businesses.  ER 37.  These businesses had the potential for expansion and profit.  ER 20, 37.

The managerial decisions the contractors made, such as whether to personally operate a truck, whether to operate multiple trucks, and how much to pay employees, impacted their profit.  ER 20, 37, 49-50.  When Affinity lost its contract with Sears, some contractors continued to provide their services to Sears at the San Diego MDO for the new carrier.  ER 20, 49.

## D. <u>Contractors Supplied Equipment and Paid Expenses</u>

Some contractors owned their own trucks.  ER 22.  Others contractors leased the trucks they supplied from third-party equipment vendors or a sublease Affinity facilitated.  ER 22.  Pursuant to the sublease arrangement, Affinity rented trucks from Ryder Truck Rental and then subleased those trucks to contractors, who in turn leased the trucks *plus a driver* back to Affinity pursuant to the ELA and the FLR.  ER 10-11, 22, 31.  To minimize the risk that the subleased trucks would be vandalized with graffiti, Hansen, who managed the Sears account, "strongly discouraged" contractors from taking the subleased trucks home overnight.[6]  ER

---

[5] Affinity aided contractors in setting up their businesses by helping contractors complete the necessary forms.  ER 19, 37.

[6] On days contractors were not operating their trucks, Affinity would on occasion allow others to use the trucks to make deliveries, and contractors were not compensated for this use.  ER 18, 22, 43.

18. As a result, "the drivers were not allowed to take their trucks home or to operate them for other companies or for personal use." ER 18, 22, 43. Regardless of whether a contractor procured a truck from an outside vendor or pursuant to the sublease agreement, the *contractors, not Affinity*, furnished the trucks. ER 22, 27-28, 50-51.

In addition to the trucks, contractors, not Affinity, supplied and paid for the tools they carried, such as protective blankets, pads, and tie down straps. ER 27-28, 46. The contractors also leased phones from Affinity and paid the monthly service charges. ER 15, 27-28.

Under the ITA and ELA, contractors also paid for and carried various types and amounts of insurance. ER 47. Affinity facilitated insurance policies for contractors, but contractors could shop for cheaper policies, and Affinity generated no profit from the insurance facilitated by Affinity.[7] ER 48.

### E.    Contractors Supplied and Paid Drivers and Helpers

Affinity did not require contractors to personally perform any labor . ER 14-15, 33, 751-57, 758-69. The contractors could and did hire other drivers to load and drive the trucks, run the routes, make the deliveries, unload the trucks, and

---

[7] Contractors received Insurance Certificates to be carried in their trucks, as mandated by law, as proof of the insurance obtained. ER 48.

perform virtually all other aspects of the job.[8]  ER 14, 33, 751-57, 758-69.  Indeed, each of the contractors who testified operated multiple trucks and hired and paid the drivers and helpers to operate those extra trucks.[9]  ER 27, 33.

While Affinity required contractors to have all their helpers and second drivers approved, Sears and government regulations required Affinity to do so.  ER 33, 35.  To that end, each helper had to submit to a background check, and second drivers were subject to the same qualification criteria as the original contractor.  ER 33.

Affinity paid contractors for the deliveries the contractor and/or the contractors' employees completed.  ER 20, 36.  Contractors then decided how much to pay their employees and withheld taxes from those wages.  ER 20, 36, 74, 392.

## F.     Customer Needs Dictated Routes

While the number of customer deliveries Sears required dictated the number of routes available each day, contractors could decide how many days a week to operate one or more of their trucks when routes were available.  ER 40.  Some

---

[8] While Affinity encouraged some contractors to operate multiple trucks, the contractors were the ones who ultimately decided to run or stop running multiple trucks.  ER 33.

[9] At least one contractor operated up to four trucks at one time.  ER 33.

contractors elected to run their trucks, whether personally or through employees, four-five days a week, while others ran their trucks seven days a week. ER 40.

On days when they were in service, contractors' trucks operated at least eight hours per day and made around 18 deliveries per day. ER 52. Contractors were also given the opportunity to be on a "standby" list, which allowed them to pick up an extra route. ER 40.[10] Contractors who performed "standby" runs received the per-stop compensation associated with the deliveries as well as additional compensation. A contractor who accepted, but did not perform a route, could be charged for the cost of procuring the standby driver. ER 40.

## G.   Customer Needs Dictated Delivery Locations and Timing

Contractors and/or their employees picked up and loaded the furnishings and appliances the contractors agreed to deliver from Sears' San Diego MDO. ER 10, 16, 51. Contractors, not Affinity, controlled the exact time they arrived at the San Diego MDO.[11] ER 38, 39. Contractors then spent the majority of the day on the road or in the homes of Sears' customers. ER 51.

---

[10] If a contractor did not want to work on a day when routes were available or the contractor had already accepted a route, the contractor could pay a driver he employed or one of the standby drivers to perform the contracted work. ER 38.

[11] Ruiz chose to show up at 5:30 a.m., instead of 6:30 a.m., as the other contractors testified. ER 39. While contractors were free to arrive at 9:00 a.m., doing so would impact the ability to choose their routes for the day. ER 16, 39.

Sears set the order of the deliveries in the manifest consistent with the promises it made to its customers regarding delivery times.  ER 44.  Generally the contractors could not change the order of deliveries without first seeking permission from Affinity because customers needed to be contacted prior to any change to ensure the customer would be home for the delivery.  ER 40, 44.  But contractors also testified that they did not need authorization to change the order of deliveries provided the deliveries were completed within the originally scheduled delivery window.  ER 40.

After completing a delivery, contractors or their employees obtained the customer's signature on the manifest and then telephoned a Sears customer service number to confirm completion of the delivery.  ER 44.  Contractors or their employees returned to the Sears-owned San Diego MDO after all deliveries were completed to return old appliances picked up from customer homes.  ER 16, 51.

## H.    Customer Needs Dictated Standards

As a safety and security measure to put its customers at ease when contractors and/or their employees arrived at and entered customer homes, Sears imposed the following uniform requirements so that Sears' customers could identify contractors and their employees as Sears representatives: a blue-striped shirt with the words "Sears Authorized Carrier" on the back, blue pants, black

10

shoes and belt, and a cap with the Sears logo.[12]     *See* ER 15-16, 45, 46.  Affinity

made uniforms satisfying Sears' requirements available to contractors from stock

inventory if needed, but Affinity did not require contractors to purchase the

uniforms from it, nor did Affinity profit from uniform sales.[13]  ER 15, 45.  Sears

also expected drivers and helpers to have neatly groomed facial hair and no visible

body piercing or tattoos.[14]  ER 15, 45.

## I.     **Procedures Manuals Reflected Requirements**

Affinity prepared procedures manuals reflecting additional requirements

dictated by Sears and Sears' customers, not by Affinity.   ER 41, 42-43   The

procedures manuals had various sections, including sections related to manifests,

loading the trucks, protecting the merchandise, customer procedures, reporting

requirements after delivery, returns, property damage, and accidents, and

installation instructions.  ER 41.

While the contractors were supposed to receive copies of the manuals, some

contractors testified that they never did.  ER 17-18, 42.  The remaining contractors

---

[12] Affinity told contractors, the helpers and/or the second drivers that they would not be able to go on the route if they failed to satisfy the uniform and grooming requirements.  ER 34.

[13] Some contractors created their own hats embroidered with "Sears Authorized Carrier."  ER 45.

[14] Affinity supplied shaving kits in case drivers came to work with a "five o'clock shadow."  See ER 45.

testified that they did not read or rely on the manuals because they already knew how to install appliances, and proper installation was part of the services contractors and their employees agreed to provide. *See* ER 44.

## J.     Routes Contractors Selected Impacted Profits

The number of hours the contractors or their employees worked was in large part determined by the delivery routes the contractors elected to complete because the routes varied as to the number of stops and miles needed to complete the route. ER 16-17, 39.  And contractors, not Affinity, chose the roads taken to make the deliveries.  ER 38-39.  The end of each day thus depended on how quickly and efficiently contractors or their employees completed the deliveries, not on a set number of hours required by Affinity.  ER 16-17, 39.

Because the routes varied as to the number of stops and miles, route selection affected the contractors' opportunity to make money rendering certain routes more desirable.  Contractors considered the ability to select a route important.  ER 16-17, 39.  With the exception of Ruiz, contractors testified that the higher their scores were on Sears' surveys, the higher the priority they had in selecting their routes.[15]  ER 17, 39.

---

[15] The surveys were conducted by a company selected by Sears, which telephoned Sears' customers and asked them various questions regarding customer satisfaction.  ER 39.  Ruiz understood the importance of the survey scores and the impact of the surveys on the ability to pick better routes.  ER 39.

12

**K.**   **Stand-Up Meetings**

Each day, Affinity conducted a stand-up meeting to address negative comments received from post-delivery surveys, problems encountered throughout the day, and safety protocols.  ER 43.  Contractors risked receiving less preferable routes if they did not arrive prior to the stand-up meeting.  ER 16, 38.

At the stand-up meetings, Hansen sometimes discussed photos taken of contractors or their employees during the "follow-alongs" Hansen conducted about once a month at the request of Sears.  ER 46-47.  When Hansen conducted follow-alongs, Hansen would "follow the driver for a few stops, make sure that they were in the field in uniform, make sure they were using proper techniques for delivery to prevent damages to the customers' homes."  ER 47.

**L.**   **Contractors Negotiated Rates**

Contractors were paid through weekly settlements, issued approximately three weeks in arrears, $23.50 for each "delivery stop" completed.  ER 24, 52.  Contractors were able to negotiate higher payments for deliveries that proved to be particularly difficult.  ER 25, 27, 52.

**M.**   **Skills Required More Than Ability to Drive**

While contractors or their employees needed no special driver's license, the contracted work was not limited to driving the trucks.  ER 21, 50.  They needed substantial skill to deliver and install the Sears appliances, especially considering

13

the dangers involved in installing appliances hooked to gas lines or the risk of water damage from improper installations. ER 21, 50. Ruiz had extensive experience in installing such appliances. ER 50.

**N.    Ruiz Formed R&S Logistics**

Before contracting with Affinity, Ruiz decided to go into business for himself. ER 26, 30, 73, 75. Ruiz formed his own business, R&S Logistics ("R&S"), obtained a Federal Employer Identification Number, established a separate business banking account, and entered into the ITA and ELA. ER 10, 30, 73, 75. Ruiz and Affinity both understood their relationship to be that of an independent contractor. ER 26, 53. Affinity paid R&S for the work Ruiz's employee drivers and helpers performed, and Ruiz in turn paid his employees from R&S's account. ER 20, 36, 37.

While Affinity suggested reasonable amounts to pay the drivers and helpers, Ruiz decided to pay his employees an amount he believed was fair. ER 37. Ruiz, not Affinity, handled performance issues pertaining to the employees he hired. ER 37, 38. When a driver Ruiz hired operated Ruiz's truck, Ruiz sometimes lost money and took money out of his own pocket to pay his employees. ER 37. Ruiz found it more profitable to personally operate his truck, but was able to keep R&S in business when he was injured by hiring a driver. ER 27, 37. During that time, Ruiz arrived at the San Diego MDO each morning and supervised the loading of

his truck by his employee driver and helper to ensure it was properly loaded.  ER 37, 38.  Ruiz's employees then ran the route.  ER 38.  If Ruiz's employees had trouble with a route, Affinity contacted Ruiz, and Ruiz handled the problem.  ER 37-38.

## IV.
## SUMMARY OF THE ARGUMENT

The District Court confirmed that Affinity properly classified Ruiz as an independent contractor.  The District Court so found because the overwhelming evidence demonstrated that Ruiz's relationship with Affinity was a business relationship through which Ruiz invested capital (additional trucks), employed labor (drivers and helpers to operate those trucks), and enjoyed the freedom to extricate himself from personally performing *any services,* while still getting paid.  This evidence amply supports the District Court's factual findings, and Ruiz offers no basis on which to conclude otherwise.

Rather, Ruiz surreptitiously predicates his argument on the facts *he requested the District Court* to find, but which it did not, and claims that, when California law is applied to *those* facts, Ruiz must be considered an employee.  Ruiz's argument is legally and factually flawed.

Specifically, Ruiz claims that the District Court erred because it should have focused on only some, not all, of the factors California considers and because it should have applied those factors with a slant and weight to reflect California's

15

public policy that favors protecting workers.  Contrary to Ruiz's assertion, California requires courts to consider all factors that govern whether a contractor is properly classified.  Moreover, California's public policy is *already reflected* in the test the California Supreme Court crafted.  The District Court honored California's public policy when it applied California's test.  No case requires any further deference.  Indeed, to find otherwise would defeat the purpose of having a test as no court could find a contractor properly classified without running afoul of California's public policy.

Ruiz's argument is factually flawed because it rests on a characterization of evidence adduced at trial that finds no home in the District Court's factual findings.  Because Ruiz has not offered any basis on which to conclude that the District Court was clearly erroneous in its *factual determinations*, the universe of facts to which the law must be applied are contained in the District Court's opinions.  Ruiz cannot predicate his claim of *legal error* on facts the District Court did not find.  Ruiz tacitly concedes that he cannot prevail based on the facts as the District Court found them – Ruiz's Appellant's Brief is all but devoid of *any* citation to the District Court's opinions.  In other words, by relying almost entirely on *Record citations* instead of the District Court's factual findings, Ruiz concedes that he can only prevail if this Court supplants the facts *Ruiz thinks* the District

Court *should have found* for the facts the District Court *actually found*. Ruiz cites no authority or basis for doing so.

As demonstrated below, the District Court correctly found Ruiz was properly classified as an independent contractor based on the District Court's evaluation of the evidence and attendant factual findings. The District Court found Affinity established by a preponderance of the evidence that it did not reserve any right to control the work Ruiz contracted to complete. Indeed, the contracts Ruiz executed did not even require Ruiz to personally perform the services, and Ruiz, in accord with his contractual freedoms, delegated those driving services to a driver he employed when Ruiz could not drive.

Expressly weighing some facts more heavily than others, the District Court found the evidence at Trial established, *inter alia,* the following facts: contractors could delegate the driving services; contractors could (1) expand their businesses by providing multiple trucks and the services of multiple employees to operate, which Ruiz and every contractor who testified elected to do; (2) make significant investments in their equipment; (3) make managerial decisions affecting their businesses; and (4) install appliances hooked to gas and water lines requiring experience and substantial skill.

The District Court weighed these facts against evidence that the contractors were required to comply with government regulations and customer demands that

were reflected in procedures manuals that no one read, used, or relied on. Considering all of the facts of the relationship between Ruiz and Affinity, the District Court found the freedoms afforded Ruiz and the contractors under contract and in practice outweighed any presumption of employment under California law.

The District Court applied the correct multi-factor common law test under California law for purposes of determining whether Ruiz was an employee or independent contractor, and substantial evidence supports the District Court's conclusion that Affinity overcame the presumption that Ruiz was an employee. The Final Judgment should therefore be affirmed.

## V.
## <u>STANDARD OF REVIEW</u>

This Court reviews matters of discretion for abuse of discretion, questions of law *de novo*, and questions of fact under the highly deferential, clearly erroneous standard. *Lads Trucking Co. v. Bd. of Trs. of the W. Conference of Teamsters Trust Fund*, 777 F.2d 1371, 1373 (9th Cir. 1985). "Mixed questions of law and fact in which the applicable legal standard provides for a strict factual test [also] subject[] the lower court to clearly erroneous review." *Id.*; *see also Deegan v. Continental Cas. Co.*, 167 F.3d 502, 509 (9th Cir. 1999).

Ruiz contends the District Court erred in (1) its application of public policy considerations underpinning California laws enacted to protect employees; (2) its determination of the governing legal standards by considering whether Affinity

18

controlled the details of the work Ruiz performed; (3) its conclusion that Affinity

did not control the details of the work in light of the evidence presented; and (4) its

unnecessary evaluation of the secondary California common law factors.

*Appellant's Brief* at 8-50.  Ruiz further contends, for the first time on appeal, the

District Court erred because it failed to find Affinity employed Ruiz for some

purposes even if he was an independent contractor for others. [16]  *Id.* at 50-54.

Ruiz concedes that this Court should apply the abuse of discretion standard

for purposes of determining whether the District Court appropriately considered

California public policy in its analysis.  *Id.* at 2.  Without citation to authority,[17]

Ruiz contends this Court should review the District Court's decision *de novo* as to

the remaining issues he raises.  *Id.* at 2-3.

While the determination of the correct test to apply to determine independent

contractor status is a question of law subject to *de novo* review,[18] this Court has

held that the "ultimate conclusion" as to whether a presumed employee is an

---

[16] Ruiz tacitly acknowledges he failed to preserve this issue and does not include it in his Statement of Issues Presented for Appeal.  *Id.* at 1-2, 50-52.  Indeed, Ruiz points to nothing in the Record that would have allowed the District Court to make such a finding (*i.e.*, who among the class personally operated a truck as well as provided additional trucks and the labor for those trucks), let alone that he requested it to do so.  This issue has therefore been waived.

[17] This represents one of many statements of the "law" peppered throughout Ruiz's Appellant's Brief without any citation to a supporting opinion or statute.

[18] *See Lads Trucking*, 777 F.2d at 1373; *Stull v. Noble Logistics Servs.*, No. C064308, 2011 WL 2225137, at *6-8 (Cal. App. Jun. 8, 2011).

independent contractor is one of fact if the determination depends upon the resolution of disputed evidence or inferences. *Narayan v. EGL, Inc.*, 616 F.3d 895, 901 (9th Cir. 2010) (acknowledging that "the trier of fact plays the principal part" in determinations of independent contractor status and finding no "legal overlay to the factual question . . . affect[s] the role of the trier of fact").[19]

Thus, when the parties have presented conflicting evidence bearing on whether an individual is an independent contractor, and "the trial has been by the court sitting without a jury, the familiar rule that the Court's findings must stand unless clearly erroneous applies." *McGuire*, 349 F.2d at 646 ("determination of an individual's status as an employee or an independent contractor is one of fact").[20] A district court's determination of independent contractor status is only a question of law when the evidence is undisputed. *Narayan*, 616 F.3d at 901.

These standards of review are consistent with governing principles of California law. *S.G. Borello & Sons, Inc. v. Dep't. of Indust. Rel.*, 769 P.2d 399, 404 (Cal. 1989) (holding "determination of employee or independent-contractor

---

[19] *McGuire v. U.S.*, 349 F.2d 644, 646 (9th Cir. 1965) (indicating independent contractor status is factual determination).

[20] *See also Lads Trucking*, 777 F.2d at 1373; *Chin v. U.S.*, 57 F.3d 722, 725 (9th Cir. 1995) (mixed question of law and fact reviewed for "clear error"); *Van Camp & Bennion v. U.S.*, 251 F.3d 862, 865 (9th Cir. 2001); *Prof'l & Executive Leasing, Inc. v. Comm'r IRS*, 862 F.2d 751, 753 (9th Cir. 1998); *Wirts v. San Francisco & Oakland Helicopter Airlines, Inc.*, 370 F.2d 328, 328 (9th Cir. 1966) (same); *Purer & Co. v. Aktiebolaget Addo*, 410 F.2d 871, 878 (9th Cir. 1969).

status is one of fact if dependent upon the resolution of disputed evidence or inferences, and the [fact-finder's] decision must be upheld if substantially supported."); *Estrada v. FedEx Ground Package System, Inc.*, 64 Cal. Rptr. 3d 327, 337 (Cal. Ct. App. 2007) (reviewing *only* whether substantial evidence supported trial court's factual findings).[21]

## VI.
## ARGUMENT

Ruiz used the employees *he hired* to perform the delivery services and operate the delivery equipment he contractually agreed to provide. Indeed, under the ITA and ELA, Ruiz never even had to set foot inside the San Diego MDO to satisfy his contractual obligations – and for the majority of his relationship with Affinity, Ruiz hired *others* to perform deliveries while personally performing none. Ruiz exercised managerial decisions over his business, including setting his employees' rates of pay, deciding on the number of trucks to supply, deciding whether to purchase or lease those trucks through a third-party equipment vendor or the sublease Affinity facilitated, and deciding whether to personally operate a truck.

---

[21] *Cristler v. Express Messenger Sys., Inc.*, 89 Cal. Rptr. 3d 34, 39 (Cal. Ct. App. 2009) ("the substantive determination (employee or independent contractor) is one of fact . . . must be affirmed if supported by substantial evidence") (citation omitted); *Arzate v. Bridge Terminal Transp.*, 121 Cal. Rptr. 3d 400, 404-05 (Cal. Ct. App. 2011); *Stull*, 2011 WL 2225137, at *6-8.

The District Court weighed this evidence against evidence related to application, approval, monitoring, and appearance requirements that either Sears or the federal government imposed and found the preponderance of the evidence weighed in favor of finding (1) Affinity neither reserved the right to nor exercised control over the details of the work Ruiz contracted to complete and (2) the application of the secondary factors considered under California law to the facts of the entire arrangement between Ruiz and Affinity confirmed Ruiz's status as an independent contractor.

Ruiz had his day in court, and the District Court found Affinity carried its burden to prove that Ruiz and the other contractors were independent contractors. As set forth below, the District Court applied the correct presumptions and legal standards in reaching this determination. Because the District Court considered and weighed the totality of the evidence based on the issues before it, its conclusion should not be disturbed.

## A.    Substantial Evidence Supports the District Court's Findings

As noted above, this Court reviews the question of whether a district court correctly determined independent contractor status for clear error. *McGuire*, 349 F.2d at 646; *Van Camp*, 251 F.3d at 865; *Chin*, 57 F.3d at 725; *Prof'l & Executive Leasing*, 862 F.2d at 753; *Wirts*, 370 F.2d at 328. Because the findings of a district court in this regard are presumptively correct, a recitation by an appellant of "their

version of the evidence in an attempt to establish the incorrectness of the findings made by the trial court" does not provide a basis for reversal. *Purer*, 410 F.2d at 878.

Rather, the reviewing court should consider the evidence presented at trial "in the light most favorable to the parties who prevailed below. Such parties must be given the benefit of all inferences that may reasonably be drawn from the evidence." *Id.*

If a finding by the trial court is supported by substantial evidence, the reviewing court has "no power to change it." *R.A. Beaver v. U.S.*, 350 F.2d 4, 11 (9th Cir. 1965); *see also Jones v. U.S.*, 127 F.3d 1154, 1156 (9th Cir. 1997) ("If the district court's account of the evidence [adduced during a bench trial] is plausible in light of the record viewed in its entirety, we may not reverse even if we are convinced that had we been sitting as the trier of fact, we would have weighed the evidence differently").[22] A reviewing court deems a finding clearly erroneous only when it "is left with the definite and firm conviction a mistake has been committed

---

[22] *See also Recon Refractory & Constr., Inc. v. NLRB*, 424 F.3d 980, 985 (9th Cir. 2005) (factual finding  must be affirmed "where the relevant evidence is such that a reasonable mind might accept it as adequate to support a conclusion—even if it is possible to draw a contrary conclusion from the evidence") (quotation omitted); *Cristler*, 89 Cal. Rptr. 3d at 39; *Stull*, 2011 WL 2225137, at *4 ("Our power begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, that will support the finding").

[and] will not ransack the record, searching for mistakes." *Casillas v. U.S. Navy*, 735 F.2d 338, 342-43 (9th Cir. 1984).

Under this standard, the reviewing court may not "retry issues of fact nor supplant the district court's judgment with that of [its] own." *State Farm Mut. Auto. Ins. Co. v. White*, 563 F.2d 971, 977 (9th Cir. 1977); *see also Jones*, 127 F.3d at 1156; *Cristler*, 89 Cal. Rptr. 3d at 39; *Stull*, 2011 WL 2225137, at *4. And it has "no warrant to review the evidence as to its weight and credibility." *Thomas v. Andrus*, 552 F.2d 871, 872 (9th Cir. 1977).

Ruiz bears the burden to persuade this Court that the District Court's findings were clearly erroneous. *Purer*, 410 F.2d at 878; *Deegan*, 167 F.3d at 509 *see also Stull*, 2011 WL 2225137, at *4. Instead of doing this, Ruiz attempts to reweigh the evidence by questioning the District Court's factual findings and asking this Court to substitute Ruiz's view of the evidence in place of the District Court's.[23] Because Ruiz makes no effort to identify any "clear error," he acknowledges the evidence overwhelmingly supports the District Court's decision that Ruiz was an independent contractor. *See Cristler*, 89 Cal. Rptr. 3d at 39 n.2; *Deegan*, 167 F.3d at 509. The District Court rendered its conclusion, with citation

---

[23] For example, Ruiz asserts contractors could not decide whether to personally complete deliveries on a given day (*Appellant's Brief* at 29), but the District Court found Ruiz hired a replacement driver and elected not to work for "many months" when he was injured. ER 27, 37; *see also infra* Section VI(D).

to substantial support in the record, that Affinity carried its burden of establishing that Ruiz was properly classified. *Id.*

Ruiz's Appellate Brief largely ignores the District Court's factual findings and points to evidence the District Court considered and deemed irrelevant or unpersuasive in light of countervailing evidence. Ruiz's appeal, at most, brandishes "facts" that *Ruiz thinks* the District Court *should have found*, then surreptitiously asks this Court to supplant the factual conclusions *Ruiz reached* with little to no citation to the record or the factual conclusions the *District Court* reached after considering the evidence.[24] This showing is not sufficient to substantiate a definite and firm conviction that the District Court committed a mistake, particularly as it is outside the province of this Court to retry issues of fact, review the evidence for weight and credibility, and supplant the District Court's judgment with that of its own. *State Farm*, 563 F.2d at 977; *Thomas*, 552 F.2d at 872; *Casillas*, 735 F.2d at 342-43; *Jones*, 127 F.3d at 1156; *Cristler*, 89 Cal. Rptr. 3d at 39.

Ruiz further makes numerous unsupported references comparing a "true" or "real" independent contractor relationship to the relationship between Ruiz and Affinity. The multi-factor California common law test along with the evidence

---

[24] Consistent with his practice throughout these proceedings, Ruiz makes numerous conclusory factual assertions with no evidentiary support. Ruiz's entire 54-page brief references the factual findings of the District Court on just 4 pages.

actually adduced at trial, not Ruiz's broad, unsupported assertions, form the basis of the District Court's consideration of whether Ruiz was properly classified. The District Court evaluated the evidence, applied it to the law and correctly concluded that a "real" or "true" independent contractor relationship existed between Affinity and Ruiz. ER 8-28.

## B.     California Law Prescribes A Multi-Factor Test

California law considers the right to control the manner and means, or "details," of the work performed as "the most important or most significant" consideration in determining independent contractor status. *Borello*, 769 P.2d at 404; *see also Cristler*, 89 Cal. Rptr. 3d at 38; *Millsap v. FedEx Corp.*, 277 Cal. Rptr. 807, 811 (Cal. Ct. App. 1991); *Estrada*, 64 Cal. Rptr. 3d at 335.[25]

This said, the "control test, applied rigidly and in isolation, is often of little use in evaluating the infinite variety of service arrangements." *Borello*, 769 P.2d at 404; *see also Cristler*, 89 Cal. Rptr. 3d at 38. Thus, regardless of evidence bearing on the "right to control," courts construing California law must consider

---

[25] When evaluating the control factor, courts applying California law have found the evidence militates in favor of finding an independent contractor relationship when the individuals supplying the equipment and labor (1) operate more than one truck; (2) hire drivers to drive the additional truck(s); (3) decline deliveries offered by the putative employer; (4) determine what time to pick-up freight to be delivered; (5) determine how to load packages; and (6) determine the routes to make the deliveries. *See, e.g., Arzate*, 121 Cal. Rptr. 3d at 405; *Stull*, 2011 WL 2225137, at *6-8; *Brown*, 38 Cal. Rptr. at 106; *FedEx*, 758 F. Supp. 2d at 670; *Cristler TC*, 2007 WL 3128497, at *4; *Estrada TC*, 2004 WL 5631425, at *7.

several "secondary" factors "logically pertinent to the inherently difficult determination whether a provider of service is an employee or an excluded independent contractor." *Borello*, 769 P.2d at 404, 407 (citations omitted); *see also Cristler*, 89 Cal. Rptr. 3d at 38; *Estrada*, 64 Cal. Rptr. 3d at 335; *Bowman v. Wyatt*, 111 Cal. Rptr. 3d 787, 799 (Cal. Ct. App. 2010).

The "secondary" factors that courts must consider include: (1) the right to terminate at will, without cause; (2) whether the alleged employee is engaged in a distinct occupation or business; (3) whether the occupation is usually performed without supervision; (4) the skill required; (5) whether alleged employer or the alleged employee pays for business expenses; (6) the length of service; (7) the method of payment (8) whether the work is a part of the regular business of the alleged employer; (9) whether the parties believe they are creating the relationship of employer-employee; (10) the alleged employee's "opportunity for entrepreneurial profit or loss depending upon his/her managerial skill;" and (11) the use of helpers/replacements.[26] *Cristler*, 89 Cal. Rptr. 3d at 38, 44-45 (citing *Borello*); *see also Arzate*, 121 Cal. Rptr. 3d at 404-05; *Estrada*, 64 Cal. Rptr. 3d at 337.

---

[26] Despite his ample reliance on *Borello* and *Estrada*, Ruiz inexplicably refers to the Restatement Factors. *Appellant's Brief* at 37. Ruiz thus includes "'whether the principal is or is not in business,'" as a relevant factor, but this is not among the factors courts applying California law consider. *Borello*, 769 P.2d at 404, 407; *Estrada*, 64 Cal. Rptr. 3d at 337; *Cristler*, 89 Cal. Rptr. 3d at 38, 44-45.

Because these factors are "intertwined and their weight depends on different combinations," a court may not apply them "mechanically."  *Borello*, 769 P.2d at 404; *see also In re MDL-1700 FedEx Ground Package Sys. Inc. ("FedEx"), Employment Practices Litig.*, 758 F. Supp. 2d 638, 670-71 (N.D. Ind. 2010) (applying California law).  Rather, "[e]ach service arrangement must be evaluated on its facts, and the dispositive circumstances may vary from case to case." *Borello*, 769 P.2d at 407; *see also Cristler*, 89 Cal. Rptr. 3d at 43.[27]

The fact "that *other cases* addressing the proper classification of package delivery drivers have resulted in findings that the drivers were employees, rather than independent contractors," is inapposite to the determination of whether the factual determinations of a trial court are supported by substantial evidence. *Cristler*, 89 Cal. Rptr. 3d at 39 n.2 (emphasis in original).  The determinations reached by *other courts* "concern different circumstances presented to a different finder of fact.  Indeed, even if the facts of [the case under review are] *identical* to those in [other cases, a reviewing court is] not be authorized to overrule the determination of the [trial court] to achieve conformity with other cases."  *Id.* (emphasis in original).

---

[27] While the *Cristler* trial court opinion does not represent binding authority, the trial court analysis is useful due to the similarity of the facts in *Cristler* to the facts established in this case.  *Cristler v. Express Messenger Sys., Inc.*, No. GIC 803519, 2007 WL 3128497 (Cal. Super. Ct. Feb. 26, 2007) ("*Cristler TC*").

Despite ample legal authority requiring courts applying California law to consider *all* of the factors set forth above, Ruiz contends *Borello* established a controlling "three-factor analysis" for purposes of determining independent contractor status. *Appellant's Brief* at 16-23. In the alternative, Ruiz contends the analysis of whether an individual was an employee or independent contractor begins *and ends* with the determination of whether the putative employer had the right to control the work the individual performed. *Id.* at 23-24.

The law, including the cases Ruiz relies on, squarely rejects Ruiz's contentions. While the *Borello* court found some of the factors demanded greater weight due to the facts of *that case*, the *Borello* court expressly indicated that its decision "adopt[ed] *no detailed new standards* for examination of" independent contractor status, "[e]ach service arrangement must be evaluated on its facts, and the dispositive circumstances may vary from case to case." *Borello*, 769 P.2d at 406-07. The California Court of Appeals recently acknowledged the same when it found that *Borello* and other cases may have emphasized factors other than control "in various ways—in evaluating whether substantial evidence supports a finding of the trier of fact," but "those cases do not purport to redefine the factors themselves. Nor does *Borello* [suggest] that different legal standards apply in the context of different occupations." *Cristler*, 89 Cal. Rptr. 3d at 39 n.2.

Indeed, the California Court of Appeals recently found a jury instruction incorrectly prejudicial because it stated that the jury "must conclude" an individual was an employee "if it decided that the [putative employer] had the right to control how [the individual] performed his work" and "should consider the secondary factors only if [it] decide[d] that the [putative employer] did not have the right of control." *Bowman*, 111 Cal. Rptr. 3d at 799; *see also MCAA*, 96 Cal. Rptr. 3d at 809-10.

## C.     California Public Policy Underpins the Multi-Factor Test

Under the California Workers' Compensation Act, an individual who adduces evidence he furnished services for another is presumed to be an employee. *Borello*, 769 P.2d at 404 (citing Cal. Lab. Code §§ 3351, 3353, 5705(a)).  A putative employer may overcome this presumption if it proves the presumed employee was an independent contractor by a preponderance of the evidence pursuant to the factors as outlined above. *See, id.*; *Narayan*, 616 F.3d at 900.

Following *Borello*, some courts have applied this rebuttable statutory presumption to employment status determinations outside the context of workers' compensation cases.  *See, e.g.*, *Narayan*, 616 F.3d at 900; *JKH Enters., Inc. v. Dep't of Indus. Relations*, 48 Cal. Rptr. 3d 563, 579 (Cal. Ct. App. 2006).  But the Supreme Court of California recently squelched the notion that the same public policy considerations at play in *Borello* extend to the determination of independent

contractor status for purposes of "wage claims." *Martinez v. Combs*, 231 P.3d 259, 284 (Cal. 2010) (noting Supreme Court of California only applied "the common law test of employment in light of the remedial purposes of the *workers compensation law*" in *Borello* (emphasis added)).

Prior to the Supreme Court of California's express acknowledgement of the limited scope of the public policy considerations in play in *Borello*, a federal district court applied *Borello's* multi-factor test but declined to allow the remedial purpose of the Workers' Compensation Act to color its determination of whether certain delivery drivers were independent contractors or employees for purposes of California wage and hour laws because (a) California wage and hour statutes are intended to protect employees from being deprived of due wages and (b) the drivers agreed to bear certain expenses of their work and accept pay in a way to account for those expenses. *FedEx*, 758 F. Supp. 2d at 670-71.

Without acknowledging these limitations, Ruiz extols the history of California laws enacted for the protection and benefit of *employees*,[28] and contends

---

[28] Save for *Borello*, none of the cases Ruiz cites regarding the liberal construction afforded statutes enacted for the protection and benefit of employees involve allegations of independent contractor misclassification. *Appellant's Brief* at 8-16.

California's public policy of protecting employees requires courts to draw every possible inference in favor of employment.[29] *Appellant's Brief* at 8-16.

No case supports Ruiz's assertion. Indeed, if California required courts to draw inferences in favor of employment, *no* company could utilize independent contractors. Of course, several courts have confirmed delivery drivers as independent contractors under California law, and no case mentions, let alone compels, the evidentiary inferences to which Ruiz claims to be entitled. *See, e.g.*, *Cristler*, 89 Cal. Rptr. 3d 43; *State Comp. Ins. Fund v. Brown*, 38 Cal. Rptr. 2d 98, 106 (Cal. Ct. App. 1995); *Millsap*, 277 Cal. Rptr. at 811; *Bohanon v. James McClatchy Publ'g Co.*, 60 P.2d 510, 514-15 (Cal. Ct. App. 1936); *Stull*, 2011 WL 2225137, at *6-8; *FedEx*, 758 F. Supp. 2d at 670; *Sahinovic v. Consol. Delivery & Logistics, Inc.*, No. C 02-4966 SBA, 2004 WL 5833528, at *4, 9 (N.D. Cal. Sept.

---

[29] The enactment of Section 226.8 of the California Labor Code more than *seven years after* Ruiz terminated his contracts with Affinity lends no support to Ruiz's contention that California law requires courts to draw inferences in favor of employment. While Section 226.8 seeks to limit "willful" misclassification of employees as independent contractors, Ruiz does not allege any "willful" conduct by Affinity (because he cannot) and Section 226.8 does not ban the *legitimate* classification of businessmen as independent contractors. Nor, of course, does Section 226.8 trigger the evidentiary inferences Ruiz requests. It is entirely irrelevant to the pending appeal.

13, 2004); *Estrada v. FedEx Ground*, No. BC 210130, 2004 WL 5631425, at *7 (Cal. Super. Ct. Jul, 26, 2004) ("*Estrada TC*") (all applying California law).[30]

Instead, the multi-factor test itself is designed to "determine independent contractorship in light of the remedial purposes of the legislation." *Borello*, 769 P.2d at 407. Thus, the *Borello* court baked the "the purposes of the protective legislation" into the cake that is the multi-factor common law test California law applies. *See id.*

## D.  The District Court Correctly Applied the Multi-Factor Test

The District Court found that a preponderance of the evidence weighed in favor of finding (1) Affinity neither reserved the right to nor exercised control over the details of the work Ruiz contracted to complete and (2) the application of the secondary factors considered under California law to the facts of the entire arrangement between Ruiz and Affinity confirmed Ruiz's status as an independent contractor. ER 1-2, 9, 19, 28.

---

[30] The *Estrada* trial court deemed "Multiple Work Area" contractors ("MWA contractors") (*i.e.*, contractors who had more than one truck, operated more than one route, and hired employees to run additional route(s)) independent contractors, and that decision was not appealed. *See FedEx*, 758 F. Supp. 2d at 656-57. *Estrada TC* does not represent binding authority, but the trial court analysis is useful due to the similarity of the opportunities for profit offered to the MWA contractors deemed to be independent contractors in *Estrada TC* and the opportunities for profit offered to Ruiz and the contractors.

In reaching these conclusions, the District Court examined the "overall arrangement between the parties." *Borello*, 769 P.2d at 406. While unnecessary, the District Court's Final Judgment demonstrates that it considered California's overarching public policy when it weighed some of the "intertwined" factors more heavily than others.[31] ER 13-28.

Indeed, rather than simply regurgitating the same legal conclusions it reached when it considered the evidence adduced at Trial in light of the same or similar factors applied under Georgia law, the District Court, after the parties re-briefed the issues, reconsidered the evidence anew and reached new conclusions with respect to weight and inferences to be drawn. *Compare, e.g.*, ER 51 *and* ER 23-24. The District Court did not clearly err when it found that Affinity overcame any presumption that Ruiz was an employee. *R.A. Beaver*, 350 F.2d at 11; *Deegan*, 167 F.3d at 509; *see also Cristler*, 89 Cal. Rptr. 3d at 43; *Estrada*, 64 Cal. Rptr. 3d at 347.

---

[31] As discussed above, no case required the District Court to "overlay" California's public policy over the elements of the reclassification test. The test captures that public policy in its elements. Even so, there is still no basis for reversal under the abuse of discretion standard because a trial court only abuses its discretion when its findings are "arbitrary, fanciful or unreasonable, or where no reasonable man or woman would take the view adopted by the trial court." *Golden Gate Hotel Ass'n v. City & County of San Francisco*, 18 F.3d 1482, (9th Cir. 1994); *see also Gonzales v. Free Speech Coal.*, 408 F.3d 613, 618 (9th Cir. 2005) (abuse of discretion review is "limited to assuring that the district court's determination had a basis in reason"). Ruiz has made no such showing.

### 1.   The District Court Correctly Found Affinity Neither Reserved the Right to Control nor Controlled the Details of the Work

The District Court found the preponderance of the evidence adduced at trial supported the conclusion that Affinity neither had the right to nor exercised control over the manner and means or "details" of the work the contractors completed.  ER 13-20, 27, 22.   The District Court's conclusion was supported by its factual findings that (1) Ruiz and the other contractors could "hire other drivers to load the trucks, drive the trucks, run the routes, make the deliveries, unload the trucks, and perform virtually all other aspects of the job" and (2) Ruiz and the other contractors "operated multiple trucks to complete the deliveries on any given day and hired drivers and helpers to staff those extra trucks."  ER 14, 33.  The District Court found this evidence compelling because it recognized any alleged control over Ruiz could not survive the disconnect effected by Ruiz's ability to delegate all of the deliveries *he might otherwise personally perform* to his employees, which he did for many months.  ER 11, 14, 18; 27, 33, 36-37, 40, 53 .[32]

---

[32]  The California cases finding an employment relationship involve starkly different operations with significant exercise of control by the putative employer. For example, in *FedEx v. Estrada,* the court disregarded an independent contractor designation when the company coordinating deliveries (1) required drivers to work on set days; (2) required drivers to be at the terminal at regular times; (3) unilaterally reconfigured routes; (4) did not allow drivers to select routes; and (5) did not allow drivers to refuse deliveries.  *Estrada*, 64 Cal. Rptr. 3d at 336-37; *see also Air Couriers Int'l. v. Emp't Dev. Dep't*, 59 Cal. Rptr. 3d 37, 42 (Cal. Ct. App. 2007). Indeed, even *Estrada* found that contractors who operated multiple trucks
Continued

The District Court weighed this "strong evidence" against less persuasive evidence related to application, approval, monitoring, and appearance requirements of the workers Ruiz and the contractors employed.  ER 14-19.  Some of these requirements the District Court noted were reflected in procedures manuals that no one read, used, or relied on.  ER 17-18, 42, 44, 49.  Though the District Court acknowledged all of these requirements, the District Court found them to be attributable to third parties—Sears and the federal government.  ER 42-44. 42-43.  Consistent with ample authority from California and other courts that compliance with third party requirements does not necessarily constitute control by the putative employer,[33] the District Court concluded these requirements did not establish an employer-employee relationship.  ER 15-17, 35, 40, 42-44.

_____

with employees, like every contractor who testified at trial in this case, were independent contractors. The court reached this conclusion because the MWA contractors had "the opportunity to hire drivers and slowly but surely create a little financial empire under the aegis of [the alleged employer]."  *Id*.; *see also FedEx*, 758 F. Supp. 2d at 656.

[33] *E.g.*, *Amerigas Propane, LP v. Landstar Ranger, Inc.*, 109 Cal. Rptr. 3d 686, 698 (Cal. Ct. App. 2010) (compliance with the federal regulations does "not transform an agreed upon independent contractor relationship between the carrier and truck owner/operator into an employee relationship under state law"); *Millsap*, 277 Cal. Rptr. at 811 (confirming independent contractor status of delivery driver even though driver was required to obtain signature of customer upon delivery); *Sw. Research Inst. v. Unemp't Ins. Appeals Bd.*, 96 Cal. Rptr. 2d 769, 771 (Ct. App. 2000) ("principal is not exercising the manner and means of control as an employer" when it requires compliance with government requirements); *Bohanon*, 60 P.2d at 515 (requirement to complete delivery by certain time relates to customer satisfaction and goes to end result, not control over details); *Stull*, 2011 Continued

The District Court also weighed evidence that the Ruiz, not Affinity, controlled the exact hours he worked each day and could choose which routes to complete against evidence that Ruiz attended meetings.  ER 14, 16-17, 25, 36, 38, 40.  While the District Court found the required attendance at meetings indicated some measure of control over the hours Ruiz worked, the District Court found the preponderance of the evidence nevertheless favored a finding that Affinity did not sufficiently control the hours worked to create an employment relationship because Ruiz and the other contractors chose which routes to complete and controlled the exact hours they worked each day.  ER 14, 16-17, 25, 36, 38, 40.  The District Court's conclusions in this regard are supported by ample evidence that Ruiz and the other contractors determined how many days per week to run their trucks and *whether to operate the trucks personally* or with employees.  ER 14, 16-17, 25, 36, 38, 40.  Consistent with the District Court's conclusion, *no California case has*

---

WL 2225137, at *2 (confirming independent contractor status of delivery driver when driver was required to submit signed invoice as proof of delivery); *Sahinovic*, 2004 WL 5833528, at *4, 9 (confirming independent contractor status of delivery drivers when complained-of requirements (including appearance requirements) stemmed from customer demands and government requirements); *FedEx*, 758 F. Supp. 2d at 660, 670-74 (concluding "customer-based constraints on the drivers are results-oriented controls that don't indicate employee status"); *see also SIDA of Haw., Inc. v. NLRB*, 512 F.2d 354, 359 (9th Cir. 1975) (finding "government regulations constitute supervision not by the employer but by the state); *FedEx Home Delivery v. NLRB*, 563 F.3d 492, 497 (D.C. Cir. 2009) (rules based on concern for customer service (including appearance requirements) generally do "not create an employee relationship").

held that an independent contractor was actually an employee, where as here, the contractor had an opportunity for profit or loss, could operate multiple trucks and hire employees to do so, and *could elect not to perform any of the services himself*.

Finally, while the District Court recognized Affinity limited the use of subleased trucks when Ruiz and the other contractors or their employees were *not working*, the District Court found this evidence failed to demonstrate Affinity controlled "the manner and means [Ruiz and the other contractors used] *while they [were] working*." ER 18 (emphasis in original).

On balance, the District Court found the preponderance of the evidence compelled the factual conclusion that "Affinity carried its burden to demonstrate that it did not exercise the requisite level of control that would suggest an employee-employer relationship."[34] ER 18-19.

Ruiz erroneously contends the District Court improperly weighed this factor because (according to Ruiz), consideration of this factor alone in light of California public policy compelled a finding of employment without consideration of the

---

[34] While the outcomes of other cases are not dispositive (*Cristler*, 89 Cal. Rptr. 3d at 39 n.2), the District Court's conclusion is consistent with ample California authority finding a company coordinating deliveries may impose "controls to guarantee the integrity of the delivery process" without rendering itself subject to the obligations and liability imposed by law upon employers. *E.g.*, *Stull*, 2011 WL 2225137, at *8 (citing *Millsap*, 277 Cal. Rptr. at 811; *Bohanon*, 60 P.2d at 514-15; *see also Brown*, 38 Cal. Rptr. at 106; *Cristler TC*, 2007 WL 3128497, at *4; *FedEx*, 758 F. Supp. 2d at 670; *Cristler TC*, 2007 WL 3128497, at *4; *Estrada TC*, 2004 WL 5631425, at *7.

secondary factors. *Appellant's Brief* at 24-35. But this proposition finds no basis in California law. *See supra* Section VI(B)-(C). This notwithstanding, Ruiz's insistence on ignoring the District Court's factual findings is an acknowledgment that this Court cannot reach the result he desires based on the facts as the District Court found them. As discussed above, this Court will not substitute its own judgment regarding the weight to be accorded the evidence the District Court considered. *Id.*

For example, the District Court weighed the evidence and found, as a matter of fact, "Affinity did not directly control the number of hours worked each day, or at what time Plaintiffs ended their day." ER 16. Ruiz declares the "District Court failed to make a common sense conclusion" and should have found Affinity "dictate[d] the drivers' overall work schedules." *Appellant's Brief* at 29. That the District Court reached a conclusion that Ruiz did not consider "common sense," does not change the fact that the District Court's conclusion was supported by substantial evidence and therefore not "clearly erroneous." *Casillas*, 735 F.2d at 342-43; *Deegan*, 167 F.3d at 509.

Ruiz further contends it "is indisputable that the . . . ITA and ELA, which incorporate the Procedures Manual, gave Affinity the right to control the details of the drivers' work . . . in near totality," but does not acknowledge that the District Court's found otherwise. *Appellant's Brief* at 38. The District Court found the

39

ITA and ELA did not incorporate, but only referenced, limited sections of the Procedures Manuals. ER 48-49. Moreover, the District Court also found the "procedures" the Manuals reflected were "dictated by Sears and Sears' customers, not by Affinity" and related only to the services the contractors agreed to provide (i.e., the end result), not the manner of performance.[35] ER 17-18, 42-44, 48-49.

The District Court found Affinity did not retain or exercise control over the *performance of the details* of the work sufficient to establish an employer employee relationship. ER 14-15, 18-19. Ruiz has offered no basis on which this Court could conclude that the District Court's findings were unsupported by the evidence or otherwise clearly erroneous.[36] Having failed to do so, Ruiz cannot avoid the import of these findings by asking this Court to reweigh the evidence or

---

[35] Ruiz attempts to persuade this Court that it should find the relationship of the parties similar to the relationship of the putative employer, a grower, and the crop harvesters the *Borello* court deemed to be employees. *Appellant's Brief* at 6, 17-18, 23. But, in *Borello*, the court found that the grower's use of a customer's form contract could not obviate the evidence of control the grower exercised when "[u]nder the contract and in reality, the harvesters are recruited by [the grower] to work on [the grower's] land harvesting crops owned by [the grower] until sold after harvest to [the customer]." *Borello*, 769 P.2d at 458 n.13. Unlike the *Borello* court, the District Court found the evidence demonstrated Affinity merely coordinated transportation and delivery services for its customer (Sears), and Ruiz and his fellow contractors did not use any Affinity-owned equipment, products, or premises. ER 22-23, 27-28, 40.

[36] *Purer*, 410 F.2d at 878; *State Farm*, 563 F.2d at 977; *Thomas*, 552 F.2d at 872; *Casillas*, 735 F.2d at 342-43; *Cristler*, 89 Cal. Rptr. 3d at 39; *cf. Narayan*, 616 F.3d at 901.

"ransack the record, searching for mistakes." *Casillas*, 735 F.2d at 342-43; *Thomas*, 552 F.2d at 872.

As such, even under the alternate legal standards Ruiz proposes, the Final Judgment should be affirmed.

### 2.     The District Court Correctly Found the Secondary Factors Confirmed Independent Contractor Status

The District Court also considered the evidence anew in the context of the secondary factors California law requires.  In doing so, the District Court considered its factual findings, weighed the significance of each factor in light of the overall relationship between Affinity and the contractors, and found the preponderance of the evidence supported the conclusion that Ruiz and the other contractors were independent contractors. ER 15, 18, 20, 23.  *Cristler*, 89 Cal. Rptr. 3d at 38, 44-45 (citing *Borello*, 769 P.2d at 404, 407); *see also Arzate*, 121 Cal. Rptr. 3d at 404-05; *Estrada*, 64 Cal. Rptr. 3d at 347.

### a.     Right to Terminate at Will and Length of Relationship

The District Court considered evidence that the ITA and ELA could be terminated on 60-days written notice without cause, but found this fact did not favor either party because a mutual termination provision is consistent with either an employment or independent contractor relationship.  ER 19 (citing, *e.g.*, *Arnold v. Mut. Of Omaha Ins. Co.*, 135 Cal. Rptr. 3d 213, 220 (Cal. Ct. App. 2011);

*Varisco v. Gateway Sci. & Eng'g, Inc.*, 83 Cal. Rptr. 3d 393, 397-98 (Cal. Ct. App. 2008).

The District Court further considered evidence of the automatic renewal clauses and the relative length of the relationship between Affinity and some of the contractors.  ER 23-24.  While the District Court previously found that this evidence was not indicative of either an independent contractor or employee relationship under Georgia law (ER 51), the District Court determined that the automatic renewal clauses and "prolonged service" are at odds with "notion that an independent contractor is someone hired to achieve a specific result" under California law.  ER 23-24.[37]  As such, the District Court found this factor weighed in favor of employment status under California law.  ER 24.  This was the only factor that the District Court found weighed in favor of employment status.[38]  ER 28.

### b.    Distinct Occupation or Business

The District Court found Ruiz and the other contractors established, operated, and managed independent businesses with separate business names,

---

[37]  In *Narayan*, this Court found a genuine issue of fact precluded summary judgment and *remanded* the case to the district court.  616 F.3d at 904.  This Court *did not*, as Ruiz contends, find "delivery drivers with renewal clauses in contracts" to be employees.  *Appellant's Brief* at 47.

[38]  Not every factor must point in the same direction to find employment or independent contractor status.  *E.g.*, *Borello*, 769 P.2d at 407.

banking accounts, and obligations to the employees Ruiz and the other contractors hired.  ER 14-15, 20, 22, 33, 25-25, 27-28, 36-37, 46, 49-52.

In reaching this factual finding, the District Court considered evidence that Ruiz and the other contractors *chose* to establish the businesses and had the opportunity to (and did) "expand their businesses by hiring more employees, operating multiple trucks, and making managerial decisions regarding the employment and performances of the employees hired.  In fact, [the contractors] and their businesses were able to continue making deliveries for Sears even after Affinity lost their contract with Sears and therefore were unable to do so."  ER 20, 49.  As discussed below, the District Court further found Ruiz and the other contractors accepted the responsibility to pay for the expenses associated with the operation of their businesses.  ER 20, 27-28, 49.  The District Court concluded the preponderance of the evidence related to this factor favored a finding of independent contractor status.  ER 10, 20, 27, 30, 36-38.

Without acknowledging that the District Court declined to weigh this factor "too heavily" in light in light of evidence demonstrating that Affinity aided and encouraged Ruiz and the other contractors to form businesses, Ruiz misstates the District Court's findings and contends the "District Court placed great weight, incorrectly, on the fact that drivers set up their own businesses" because the District Court found the contractors' ability to hire additional workers "*dispositive*

of employment status." *Appellant's Brief* at 35. Leaving aside the Ruiz's mischaracterization of the weight the District Court afforded this evidence, the fact that the District Court considered *twelve California common law factors* bearing on the *entire relationship* of the parties, demonstrates that the District Court did not view any single factor as dispositive.

Moreover, Ruiz also mischaracterizes *Estrada*, the primary legal authority he cites. Moreover, contrary to Ruiz's contention, the SWA drivers (who operated only one route) the *Estrada* court deemed employees *could not hire drivers to operate additional trucks*. 64 Cal. Rptr. 3d at 331 n.1; *see also FedEx*, 758 F. Supp. 2d at 656-57.[39]

The remainder of Ruiz's arguments in support of his contention the District Court improperly weighed this factor go only to the District Court's factual findings and Ruiz again fails to identify any "clear error," all but ignoring the *facts* the District Court found and setting forth unsupported, conclusory assertions directly contrary to the District Court's factual findings. *E.g.*, *Compare Appellant's Brief* at 20, 39-40 (alleging contractors could not continue business in absence of relationship with Affinity) *with Final Judgment* (ER 20, 49) (finding

---

[39] The *Estrada* trial court and the *FedEx* Court found MWA contractors to be independent contractors as a matter of law even though MWA contractors were subject to the same "strict controls" imposed on SWAs. *Estrada TC*, 2004 WL 5631425, at *7; *FedEx*, 758 F. Supp. 2d at 657, 674.

contractors continued their businesses for Sears after Affinity lost its contract with Sears and terminated contracts with contractors); *Appellant's Brief* at 20 (alleging contractors had no trucks absent relationship with Affinity) *with Final Judgment* (ER 22, 27) (finding some contractors owned (and did not sublease) trucks); *Appellant's Brief* at 40, 43 (asserting contractors could not negotiate rates) *with Final Judgment* (ER 25, 27, 52) (finding contractors could negotiate rates); *Appellant's Brief* at 41, 45-46 (contractors did not invest in equipment) *with Final Judgment* (ER 27-28) (finding contractors invested in materials and equipment, including subleased trucks and labor costs); *Appellant's Brief* at 46-47 (alleging Affinity provided the place of work) *with Final Judgment* (ER 23,51) (finding Affinity *did not* provide the place of work); *Appellant's Brief* at 29 (alleging contractors could not decide whether to personally complete deliveries on a given day) *with Final Judgment* (ER 27, 37) (finding Ruiz hired replacement driver and elected not to work for "many months" when he was injured).

The District Court's factual findings regarding the distinct businesses the contractors operated find ample support in the record, Ruiz cannot not argue

45

otherwise,[40] and the District Court correctly interpreted this factor's import on the question of Ruiz's classification.[41]

### c.     Work Usually Done Without Direction or Supervision/Skill Required

The District Court considered the evidence of the entire relationship between the parties and found Affinity did not direct, supervise, or control Ruiz while he performed delivery services (or, for that matter, his employee drivers when they performed those tasks under Ruiz's supervision), away from Affinity personnel, on the roads and highways, and in the homes of Sears' customers.  ER 21-22, 38, 49-50.  Ruiz was free to select his own route consistent with his delivery windows and used his knowledge in performing the deliveries and installations.  ER 14, 16-17, 21-22, 24, 33, 40, 50.  Whether he exercised it or not, Ruiz had the opportunity to determine the timing and scheduling of customer deliveries within the delivery windows set by Sears.  ER 14, 38-40, 53.

---

[40] *See supra* note 36 and accompanying text.

[41] Under California law, evidence bearing on whether the putative employee is in a distinct occupation or business includes: (1) ownership of the equipment necessary to complete the services; (2) insurance covering the contacted activity; and (3) the use of a fictitious business name and business cards.  *Cristler TC*, 2007 WL 3128497, at *4; *Stull*, 2011 WL 2225137, at *9; *cf. Sahinovic*, 2004 WL 5833528, at *8.  In addition, courts applying California law have focused on the importance of "economic realities," in the context of analyzing whether the putative employee was operating a distinct business.  *FedEx*, 758 F. Supp. 2d at 674; *Estrada TC*, 2004 WL 5631425, at *7.

While the District Court considered evidence that Affinity performed "infrequent 'follow alongs," and "monitored Plaintiffs throughout the day by requiring drivers to call in each delivery," the District Court found this evidence did not outweigh evidence that the contracted work required substantial skill, including knowledge related to plumbing issues and the dangers associated with the installation of gas appliances.[42] ER 21-22.

Ruiz identifies no legal error regarding the District Court's findings with respect to these factors.   Rather, consistent with habit, Ruiz, improperly asks this Court to retry the facts.   For example, the District Court found Ruiz made managerial decisions, "had extensive experience [and] skill in recognizing potential complications and hazards" attendant to the installation of appliances, engaged in the type of work performed by a "specialist without supervision," and demonstrate skill "beyond the ability to drive the truck."   ER 20-22, 27, 49-50. But Ruiz asks this Court to find the work Ruiz contracted to complete required no education, training, and/or managerial or other specialized skills, was not typically performed by a specialist, and merely involved "manual labor . . . taking merchandise from point A to point B and installing appliances." *Appellant's Brief*

---

[42] The District Court's factual findings related to the managerial skills Ruiz and the other contractors demonstrated, such as whether to expand their businesses, hire more employees, and invest in more equipment, provide further evidence that the skills Ruiz and the other contractors exhibited went beyond the ability to drive. ER 20, 27, 37, 49.

at 17-18, 19, 43-45.

Ruiz's request that this Court supplant the District Court's factual findings for the facts Ruiz wishes the District Court had found poorly disguises Ruiz's concession that the District Court's legal conclusions were proper in light of the District Court's factual findings.[43]

### d.     Payment of Business Expenses/Investment in Equipment

The District Court found these factors weighed in favor of independent contractor status because the preponderance of the evidence demonstrated Ruiz and the contractors not Affinity, owned and/or invested in all of the tools necessary "to conduct their business," including maps, drills, various hand tools, hand trucks, pads, ties, and telephones as well as the trucks some contractors owned and other contractors obtained pursuant to the Affinity-facilitated sublease with Ryder and

---

[43] The District Court correctly interpreted this factor's import on the question of Ruiz's classification given that (1) the "delivery of home furnishings has been recognized to be a skilled occupation" (*Merchants Home Delivery Servs., Inc. v. NLRB*, 580 F. 2d 966, 975 (9th Cir. 1978)) and (2) courts applying California law have found evidence that drivers received routes from company management, were required to make deliveries at specific times and report progress, wore uniforms identifying them as affiliated with the company, and followed instructions related to delivery procedures constituted nothing more than evidence of "the supervision necessary to perform the transportation and delivery services for" the customers of a package and delivery company and did not constitute evidence of employment (*Sahinovic*), 2004 WL 5833528, at *7.

48

telephones leased from Affinity.[44]   ER 50.   The District Court further found Affinity did not furnish Ruiz a place to work.  ER 23, 51.

In reaching these conclusions, the District Court considered evidence of the sublease Affinity facilitated for some contractors, but found this evidence did not negate the conclusion that contractors invested in and provided the subleased trucks because the sublease arrangement, including Ruiz's subsequent leasing back of his subleased truck *with a driver* was "consistent with the [FLR]."[45]  ER 22, 31. The District Court likewise considered evidence that contractors leased the phones they provided through Affinity, but found contractors nevertheless *paid* for the phone as well as costs of the service.   ER 22-23.   And, while Ruiz and his employees reported to the MDO to pick up and load the furnishings and appliances Ruiz agreed to deliver, *Sears* owned the MDO and contractors spent the bulk of their days on the road or in the homes of Sears' customers.  ER 23, 51.

---

[44] Though it did not expressly cite this evidence in support of its findings on these factors, the District Court further found Affinity paid Ruiz for the deliveries Ruiz and his employees completed, but Ruiz, in turn, bore responsibility for paying his employees, regardless of whether the amounts Ruiz received for completed deliveries covered his expenses.  ER 37.

[45] The District Court's conclusion is consistent with standard industry practice of treating as independent contractors individuals who lease equipment *to* a motor carrier, even when the contractors first lease or purchase the equipment through the carrier or a carrier affiliate.  *See, e.g.*, *Bonnetts's v. Arctic Express, Inc.*, 7 F. Supp. 2d 977 (S.D. Ohio 1998) ("[t]he fact that [the driver] chose to lease a truck from an [affiliate of the carrier] is of no consequence"); *Byers v. Comm'r*, T.C. Memo 2007-331, 2007 WL 3254338, *6 (U.S.T.C. Nov. 5, 2007).

Without acknowledging the substantial evidence supporting these findings, Ruiz insists the District Court should have found Ruiz and the other contractors had no investment in the tools they furnished. *Appellant's Brief* at 41, 46. Ruiz's suggestion also cannot be squared with the evidence that some contractors *owned their trucks.* Ruiz further contends the District Court should have found Affinity supplied the place of work, even though Ruiz acknowledges Affinity did not own the warehouse and the contractors and/or their employees were on the road all day. ER 46.

Once again, Ruiz's request that this Court supplant the District Court's factual findings for the facts Ruiz thinks that the District Court should have found compels the conclusion that the District Court's legal conclusions were proper in light of the facts the District Court did find based on its examination of the entire relationship between the parties. Ruiz has not (and cannot) provide any basis to find the District Court's factual findings were not supported by substantial evidence, and this Court need not ransack the record in search of some imagined mistake.[46]

---

[46] *See supra* note 36 and accompanying text.

### e. Method of Payment

The District Court found this factor "weigh[ed] slightly in favor of independent contractor status." [47]   ER 25, 52.  In reaching this conclusion, the District Court weighed evidence demonstrating that contractors generally received a set amount *per delivery stop* regardless of the actual time the stop required, delivery stops did not take the same amount of time, there were no set hours in a day, and contractors could negotiate a higher payments for deliveries, against testimony that some contractors worked at least eight hours per day and completed roughly the same number of deliveries each day.  ER 25, 52.

The District Court concluded that this factor militated in favor of independent contractor status because Ruiz could negotiate higher rates, something an employee could not do.  ER 25, 52.

Ruiz asks this Court to disregard these findings because contractors "showed up for work every day and were compensated for showing up every day." *Appellant's Brief* at 48.  Nothing about this unsupported contention alters the fact that contractors were *only* compensated for completed deliveries, *regardless* of

---

[47] The weight the District Court afforded this factor is consistent with California law finding this factor favors independent contractor status when the evidence demonstrates settlements vary weekly.  *Sahinovic*, 2004 WL 5833528, at *4.

whether contractors or their employees actually showed up every day.[48] *See* ER 14, 16-17, 33, 37, 52.

Ruiz has offered no basis on which to conclude that the District Court committed clear error in its finding on this factor.[49]

### f.    Work Part of Employer's Regular Business

The District Court weighed evidence demonstrating Affinity was in the logistics management business, "coordinating the delivery of merchandise and procuring the equipment and labor necessary to facilitate such delivery," and Affinity did not make deliveries or installations. It also considered evidence that Ruiz's work consisted of "delivery of customer merchandise." ER 25.

The District Court found this factor neutral to its analysis of Ruiz's status. ER 25-26.

Ruiz contends the District Court did not afford sufficient weight to this factor, implying this factor alone established the existence of an employment relationship. *Appellant's Brief* at 17, 21, 48-49. Ruiz's proposed "bright line" rule

---

[48] The District Court's conclusion that contractor compensation was based on $23.50 per delivery stop also vitiates Ruiz's comparison to the compensation in *Estrada*, where the drivers' weekly pay only "*partially* reflected [a] per-package rate." *Appellant's Brief* at 48 (emphasis added).

[49] *See supra* note 36 and accompanying text.

cannot be squared with the cases that have discounted this factor[50] or *Borello's* directive that "[e]ach service arrangement must be evaluated on its facts, and the dispositive circumstances may vary from case to case." *Borello*, 769 P.2d at 406-07. Ruiz offers no authority for his request to second-guess the weight the District Court afforded this factor. *Thomas*, 552 F.2d at 872; *Cristler*, 89 Cal. Rptr. 3d at 39 n.2.

### g.     Belief of the Parties

The District Court found that this factor favored of independent contractor status. ER 26, 53. Ruiz does not dispute that the District Court correctly weighed the evidence and the import of this factor. *Appellant's Brief* at 49-50.

### h.     Opportunity for Profit or Loss

In reaching its conclusion that this factor favored independent contractor status, the District Court considered evidence demonstrating that Ruiz and the other contractors (1) established businesses with "the potential for profit" and (2) made decisions that potentially influenced this profit, including "whether to operate the truck themselves, whether to operate multiple trucks, how much to pay

---

[50] *E.g.*, *FedEx Home Delivery*, 563 F.3d at 502 (indicating motor carriers "could never hire delivery drivers who *are* independent contractors" if courts deemed an employment relationship to exist based on this factor alone) (emphasis in original); *FedEx*, 758 F. Supp. 2d at 672; *cf. Cristler TC*, 2007 WL 3128497, at *5 ("this factor provides little assistance in distinguishing between employees and independent contractors in a delivery context.").

helpers and second drivers." ER 27, 37. The District Court also considered evidence demonstrating that Ruiz and the other contractors could negotiate higher rates for difficult deliveries.[51] ER 25, 27, 32, 37.

Ruiz neither acknowledges this factor nor contends that no opportunity for profit existed.[52] The overwhelming evidence regarding the contractors' practice of operating multiple trucks removes all doubt regarding the support for the District Court's factual findings. Moreover, the weight the District Court afforded this factor is consistent with California law finding evidence of the opportunity for profit or loss favors independent contractor status.[53]

### E.    Neither California Law nor the Record Support the Conclusion Ruiz Was Affinity's Employee for Some Purposes

Ruiz contends for the first time on appeal that the District Court should have at least found that he was *Affinity's* employee when he personally operated his truck even if Ruiz was an independent contractor when he was making managerial

---

[51] Evidence that Ruiz sometimes lost money and took money out of his own pocket to pay his helper and driver additionally supports the District Court's finding in this regard. ER 37.

[52] Ruiz largely ignores evidence related to his opportunity for profit and repeatedly points to the "control" he alleges Affinity exercised. *Appellant's Brief* at 19, 39-40. For the reasons set forth earlier, these arguments cannot disturb the District Court's factual findings nor demonstrate that it improperly weighed the relevant factors. *See supra* Sections VI(D)(1), (2)(a), (b).

[53] *E.g.*, *Cristler*, 89 Cal. Rptr. 3d at 44; *FedEx*, 758 F. Supp. 2d at 674; *Estrada TC*, 2004 WL 5631425, at *7.

decisions related to the additional delivery equipment he owned and the drivers and helpers he employed.  In the first instance, the District Court cannot be said to have erred in failing to make a finding that Ruiz never requested.

Tacitly acknowledging he waived this argument, Ruiz does not mention it in his Statement of Issues Presented for Appeal.  Ruiz's waiver notwithstanding, California law does not support the finding Ruiz requests and he did not adduce any evidence at Trial that would allow the District Court or this Court to make such a finding.

### 1.    Ruiz Waived This Issue

"Absent exceptional circumstances, [the Ninth Circuit] will not consider arguments raised for the first time on appeal."  *Alohacare v. Hawaii Dep't Human Servs.*, 572 F.3d 740, 744 (9th Cir. 2009).  A reviewing court will not "reframe an appeal to review what would be (in effect) a different case than the one the district court decided below."  *Id.*.  This rule serves to prevent "parties from sand-bagging their opponent [] with new arguments on appeal."  *Id.* at 868 n.18.

Ruiz had a "full and fair opportunity to ventilate [his] views" related to whether he was Affinity's employee for some purposes and not others and waived any error on this issue when he consistently argued he should be deemed an employee for all purposes throughout this case. *Ramirez v. City of Buena Park*,

55

560 F.3d 1012, 1026 (9th Cir. 2009).  This Court should not consider this issue raised for the first time on appeal.  *Loya*, 583 F.3d at 666.

> **2.  California Law Does Not Support the Conclusion that Ruiz Was Affinity's Employee for Some Purposes and an Independent Contractor for Others**

Ruiz contends this Court should affirm the District Court's independent contractor finding only with respect to his provision of additional trucks and drivers.  *Appellant's Brief* at 52.  Ruiz's argument in this regard is flawed on multiple grounds.

First, Ruiz mischaracterizes the holdings of the cases he cites in support of his position because *each case* Ruiz cites involves an arrangement where the individual and the company at issue *agreed* that the individual would be treated as an independent contractor for some purposes and as an employee for others and honored those arrangements in their overall relationship.  There is no evidence that Affinity and Ruiz reached such an arrangement here.

Second, honoring Ruiz's request would require this Court to rigidly, mechanically and in isolation apply the common law factors, the very practice the *Borello* court prohibited.  769 P.2d at 404.  For example, this Court would have to rigidly ignore facts related *Ruiz's* independently established business and its employees, *the attendant* opportunity for profit or loss and *Ruiz's* investment in

equipment from his limited activities as a driver to find *Affinity* employed Ruiz when he personally operated his truck and completed deliveries.

The evidence Ruiz would like this Court to ignore cannot be extricated from the very evidence that underscored the propriety of the District Court's independent contractor finding. Specifically, the District Court found Ruiz's managerial decisions included whether to operate additional trucks, how much to pay employees, *and whether to personally operate a truck.* ER 20, 27. Thus, to the extent *Ruiz* made the business decision to operate the truck himself because, for example, Ruiz "found it more profitable to operate the truck himself," *Ruiz*, not Affinity, controlled the work Ruiz completed when Ruiz drove the truck. ER 27.

### 3. The Record Contains No Evidence to Determine When Ruiz and the Other Contractors Were Employees

In addition to the absence of legal support for his request, Ruiz failed to adduce any evidence that would allow the District Court or this Court to make the findings he requests. Specifically, to the extent Ruiz requests a finding that he and the other contractors were employees during the times that they *personally* operated their trucks and made deliveries, he would have to have adduced evidence from which the District Court could determine which class member contractors personally operated their trucks and for what periods of time. Ruiz adduced no such evidence, and, as a result, he cites to none in his Appellate brief. Nor, of course, does Ruiz claim that he attempted to introduce such evidence and was

denied the opportunity. As the trial has concluded and there is need or no basis on which to justify re-opening the record or trying the case again, there is no evidentiary basis on which to grant the legally unsupported and waived request Ruiz now makes.

## VII.
## CONCLUSION

The Final Judgment should stand because substantial evidence supports the District Court's factual findings, the District Court applied the correct legal standards for determining whether Affinity rebutted any presumption that Ruiz was an employee under California law, and the preponderance of the evidence weighed in favor of finding Ruiz was an independent contractor. Affinity therefore respectfully requests that this Court **Affirm** the judgment of the District Court.

Dated: February 6, 2013                    Respectfully submitted,


                                           /s/ James H. Hanson
                                           James H. Hanson

                                           Attorney for Defendant/Appellee,
                                           Affinity Logistics Corp.

## <u>STATEMENT OF RELATED CASES</u>

Counsel for Appellee hereby certifies that he is aware of no related cases pending in this Court.  Ruiz appealed the District Court's March 22, 2010 Memorandum Decision finding the preponderance of the evidence confirmed Ruiz's status as an independent contractor under Georgia law.  ER 148-150.  On February 8, 2012, this Court vacated the Memorandum Decision, remanded this case to the District Court, and directed the District Court to apply California law to determine whether Ruiz should have been classified as an employee or independent contractor.  ER 138.

Dated:  February 6, 2013                      /s/ James H. Hanson
                                              James H. Hanson

59

## <u>CERTIFICATE OF COMPLIANCE</u>

Under Federal Rules of Appellate Procedure 32(a)(7)(B)(i) and (C), and Ninth Circuit Rule 32-1, I certify that this brief complies with the:

1.      Type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains a total of 13,979 words, excluding the parts of the brief Fed. R. App. P. 32(a)(7)(B)(iii); and

2.      Typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface of 14 points or more using Microsoft Word.

Dated:  February 6, 2013                    /s/ James H. Hanson
                                            James H. Hanson

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 6, 2013, a copy of the foregoing was filed electronically.   Notice of this filing will be sent to Daniel A. Osborn at dosborn@bandolaw.com and Elic E. Anbar at elicanbar@anbarlaw.org by operation of the Court's electronic filing system.   Parties may access this filing through the Court's system.


/s/ James H. Hanson
James H. Hanson

4848-6657-5634, v.  1